FILED

2026 May-07  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| QUANTALYTIX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-2157-GMB |
| | ) | |
| VIEN BUI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Quantalytix, Inc. filed a complaint for specific performance in the Circuit Court of Jefferson County, Alabama against Vien Bui. Doc. 1-1 at 3–10.  Bui timely removed the case to the Northern District of Alabama on the basis of diversity jurisdiction. Doc. 1.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. Doc. 13.  Before the court is Quantalytix's Motion to Remand.[1] Doc. 6.  The motion is fully briefed (Docs. 6, 10 & 11) and ripe for review.  For the following reasons, the motion is due to be granted.

## I.  RELEVANT BACKGROUND AND FACTS

Quantalytix, founded in 2016, provides "an enterprise bank management platform that organizes, manages, and analyzes bank data." Doc. 6-1 at 2.  Bui

---

[1] Bui filed a motion to dismiss in response to the complaint. Doc. 3.  Because the court must resolve the jurisdictional question first, the motion to dismiss remains pending. Doc. 9.

worked for Quantalytix from July 2020 until May 2025. Doc. 10-1 at 1.  He started as a backend developer, then became the Director of Engineering and eventually the Chief Technology Officer. Doc. 10-1 at 1.

## A.    The Complaint

In August 2022, Quantalytix and Bui entered into a Restricted Stock Award Agreement. Doc. 1-1 at 4, 12–22.  Under the agreement, Quantalytix granted Bui 7,423 shared of restricted stock consistent with its Stockholders Agreement. Doc. 1-1 at 4, 12; *see also* Doc. 1-1 at 25–41.  The Stockholders Agreement lists several events that trigger the company's right to repurchase its stock, including when "the employment or services engagement of a Stockholder is terminated." Doc. 1-1 at 4 & 29.  Within ten days of a triggering event, the stockholder must offer to sell his shares back to Quantalytix for a purchase price determined pursuant to the Stockholder Agreement. Doc. 1-1 at 29.  Thirty days after delivery of that notice, Quantalytix has the right to purchase all or a portion of the shares from the stockholder. Doc. 1-1 at 29.

The agreement next provides that the stockholder and Quantalytix should "attempt to agree upon the fair market value of the offered shares." Doc. 1-1 at 27. If they cannot agree, the fair market value will be determined "by an appraiser qualified to prepare valuations of closely-held corporations." Doc. 1-1 at 27.  The parties must "cooperate in good faith to select a mutually acceptable" appraiser and

split the cost of his services. Doc. 1-1 at 27. The appraiser's valuation of the stock is "binding and conclusive" on the stockholder and Quantalytix. Doc. 1-1 at 27–28.

Bui resigned his employment with Quantalytix in May 2025. Doc. 1-1 at 6. Although he did not offer to sell his shares back to Quantalytix, the company timely exercised its option to repurchase his stock. Doc. 1-1 at 6. Specifically, Quantalytix offered to purchase five-sixths of Bui's shares for $7.78 per share. Doc. 1-1 at 6. Because Bui did not agree with the stock valuation, the two parties entered into negotiations on the purchase price but could not come to an agreement. Doc. 1-1 at 6. The parties agreed to select an appraiser. Doc. 1-1 at 6.

Bui, however, did not select an appraiser or "provide[] any further input on an appraiser." Doc. 1-1 at 6. "Instead, Quantalytix stated it would search for an appraiser" then selected Applied Economics, LLC. Doc. 1-1 at 7. In late August 2025, the company attempted to deliver a preliminary valuation report to Bui, but he did not receive it. Doc. 1-1 at 7. About a month later, Quantalytix "requested documentation from Bui in order to execute the stock repurchase price derived from Applied Economic's valuation." Doc. 1-1 at 7. "Bui refused to move forward with the transaction." Doc. 1-1 at 7.

The instant complaint followed, in which Quantalytix alleges breach of contract and a breach of Bui's duty of good faith and fair dealing. Doc. 1-1 at 8–10. The complaint seeks specific performance, monetary damages, and other relief.

Doc. 1-1 at 8–10.

## B.    Notice of Removal

The Notice of Removal adds certain factual allegations to those stated in the complaint—many of which go to the merits of the claims. *See* Doc. 1 at 1–4, 6–7. The court focuses on those related to the amount in controversy.

When Bui received his stock in August 2022, the fair market value of his shares was $7.78 per share, which equated to a total value of $57,750.94. Doc. 1 at 1. Bui's shares accounted for approximately 6% of Quantalytix's outstanding common stock. Doc. 1 at 1. After Bui resigned and the parties could not agree on a stock price, Quantalytix unilaterally selected and engaged Applied Economics to provide an appraisal. Doc. 1 at 3. At a price of $10,000 for the preliminary valuation, Applied Economics was the cheapest appraiser Quantalytix considered. Doc. 1 at 3. The other appraiser quoted an estimate of $25,000 to $35,000. Doc. 1 at 3.

Applied Economic's preliminary valuation of the Quantalytix stock was $3.80 per share as of May 30, 2025. Doc. 1 at 3. On September 23, 2025, Quantalytix delivered a promissory note to Bui for the sale of all his shares for $28,207.40. Doc. 1 at 4. "Bui responded that Quantalytix's option to repurchase his shares had closed" and "[s]ince then, the parties have been in dispute over Quantalytix's right to force the sale of Bui's shares." Doc. 1 at 4.

The notice of removal contends that "[o]ver the course of more than three

4

years since that valuation, the value of the stock has more than doubled based on the improved financial performance of and additional investments in Quantalytix." Doc. 1 at 1. As evidence of this improvement, the notice of removal alleges the following:

- Four months after Bui's stock award, Quantalytix repurchased shares of common stock from a former employee at $13.84 per share;

- Quantalytix's annual revenue more than doubled from approximately $614,000 to approximately $1.7 million in the year leading up to May 30, 2026;

- In 2023, Quantalytix raised $3 million in financing based on a $30 share valuation; and

- In 2024, Quantalytix entered into a 3-year contract worth over $3 million.

Doc. 1 at 6.

Based on these allegations, the notice of removal contends that "the minimum fair market value of Bui's shares is in excess of $200,000, given the $13.84 valuation in December 2022 and the material improvements in financial performance and significant investments and agreement since that time." Doc. 1 at 7 (emphasis omitted). And the notice of removal claims that "[t]he amount in controversy also includes the cost of the Applied Economics valuation ($10,000) and the cost of obtaining a second valuation from a mutually acceptable appraiser pursuant to the terms of the Stockholders Agreement." Doc. 1 at 7. The notice estimates the cost of the additional valuation to be between $25,000 and $35,000. Doc. 1 at 6 & 7.

5

Accordingly, the notice of removal alleges that the amount in controversy exceeds $75,000.

## C.    Declaration of Christopher Aliotta

In support of its motion to remand, Quantalytix submitted the declaration of Chief Executive Officer Christopher Aliotta. Doc. 6-1.  Aliotta explained that the appraisal of Bui's stock at the time of the grant "was to comply with the Internal Revenue Code Section 409A and determine the fair market value for equity issuance" such that it "was not intended to address repurchase, exit, or minority interest separation events." Doc. 6-1 at 2–3.  That appraisal resulted in a fair market value of $7.78 per share "on a non-marketable, minority basis" as of April 29, 2022. Doc. 6-1 at 3.

Quantalytix retained Applied Economics in July 2025 "to perform an appraisal of its common stock in connection with Vien Bui's separation event and the company's stock repurchase option." Doc. 6-1 at 3.  "Because it was being used for a stock repurchase, the Applied Economics appraisal was more robust, in depth, and encompassing than the previous appraisal." Doc. 6-1 at 4.  Applied Economics considered the following in its valuation:

- In May 2023, Quantalytix issued a $2.5 million convertible note to raise capital and amended the note to $3 million in December 2023.  As of May 30, 2023, the convertible note had an outstanding balance of over $3.4 million;

- As of May 30, 2025, Quantalytix had over $3.7 million in total debt;

- From 2022 to 2024, Quantalytix's operating expenses increased from $659,000 to just over $2.15 million; and

- From 2022 to 2024, Quantalytix's EBITDA[2] decreased from $97,000 to $1.15 million and its EBITDA margin[3] decreased from -15.7% to -107%.

Doc. 6-1 at 3–4.  This information "had a substantial negative effect on shareholder equity." Doc. 6-1 at 4.  Applied Economics concluded that the fair market share of common stock on a non-marketable, non-controlling basis was $3.80 per share. Doc. 6-1 at 3 & 4.

### D.    Declaration of Vien Bui

Bui submitted his own declaration and exhibits in support of removal. Doc. 10-1.  Much of his declaration relates to the merits of the case. *See* Doc. 10-1 at 1–6.  Again, the court discusses the facts relevant to the amount in controversy.

Bui sets out his understanding of the financial condition of Quantalytix.  In support of his claim that Quantalytix has grown substantially" since 2022, Bui states as follows:

---

[2] EBITDA stands for Earnings Before Interest, Taxes, Depreciation, and Amortization, and measures a company's core operational profitability by excluding financing decisions (interest), government obligations (taxes), and non-cash accounting items (depreciation/amortization). *See* https://www.investopedia.com/terms/e/ebitda.asp (last visited May 7, 2026).

[3] EBITDA margin is a profitability metric measuring a company's operational efficiency by calculating earnings before interest, taxes, depreciation, and amortization as a percentage of total revenue. It shows how much cash profit is generated for every dollar of revenue, excluding non-operating expenses, and is used to compare profitability across similar companies. *See* https://www.investopedia.com/terms/e/ebitda-margin.asp (last visited May 7, 2026).

- In 2023, Quantalytix raised $3 million in financing based on a $30 million valuation of the company. The "capital raise was structured as convertible note financing," which "are commonly used as growth financing and are generally expected to convert to equity . . . . Therefore, it is my understanding that the issuance of the convertible note does not inherently correspond to a decrease in company value, even though the convertible note may appear as debt in Quantalytix's financial statements, because the note unlocked $3 million in capital for Quantalytix, and Quantalytix is unlikely to repay the principal and interest on the note";

- In 2024, Quantalytix entered into a three-year contract worth nearly $3 million;

- Between 2022 and May 2025, Quantalytix's annual recurring revenue (ARR) increased by nearly 50 percent. ARR is a better metric than EBITDA for determining the fair market value of Bui's shares in early-stage, software-as-a-service companies like Quantalytix.

Doc. 10-1 at 7–8. Bui also highlights the repurchase of 1,445 shares of Quantalytix common stock from a former employee at $13.84 per share in December 2022. Doc. 10-1 at 7–8, 54.

Bui "believe[s] the fair market value of [his] shares is higher, not lower, than the $7.78 price." Doc. 10-1 at 8. He also believes that Quantalytix intentionally excluded him from the appraisal process "in order to obtain a valuation that is unfavorable to [his] position . . . in an attempt to force [him] to sell [his] shares at an unfair price." Doc. 10-1 at 9. Bui admits, however, that he does "not have access to the full record of communications and documents exchanged between Quantalytix and Applied Economics during the appraisal." Doc. 10-1 at 6.

8

## II.  STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994).  Accordingly, this court is "empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution or otherwise authorized by Congress." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) (citations omitted).  "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted).  When the parties disagree on the court's jurisdiction, doubts are to be resolved in favor of returning the matter to state court on a properly submitted motion to remand. *Burns*, 31 F.3d at 1095.

## III.  DISCUSSION

A defendant may remove a civil action "originally filed in a state court to the federal district court when the district court has original jurisdiction to consider the case." *Lost Mtn. Homeowners Assoc., Inc. v. Rice*, 248 F. App'x 114, 115 (11th Cir. 2007).  "Original jurisdiction requires diversity of the parties or the existence of a federal question." *Id.*  Here, Bui invoked only this court's diversity jurisdiction and no federal question appears on the face of the complaint. Diversity jurisdiction exists when (1) the action is between citizens of different states and (2) the amount in

9

controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Because the parties do not dispute that there is complete diversity of citizenship, the issue before the court is whether the amount in controversy exceeds $75,000.

When the complaint does not plead a specific amount of damages, removal is proper if it is facially apparent from the complaint that the amount in controversy exceeds $75,000. *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001). In this analysis, the court "may make 'reasonable deductions, reasonable inferences, or other reasonable extrapolations' from the pleadings to determine whether it is facially apparent" that the amount in controversy has been met. *Jones v. Novartis Pharms. Co.*, 952 F. Supp. 2d 1277, 1282 (N.D. Ala. 2013) (quoting *Roe v. Michelin N. Am., Inc.*, 613 F. 3d 1058, 1061–62 (11 Cir. 2010)). If it is not facially apparent from the complaint that the amount in controversy exceeds $75,000, then the court should look to the notice of removal and any other evidence relevant to the amount in controversy at the time of removal. *Id.* at 1283. Although it is the removing party's burden to establish jurisdiction, the district court should consider all jurisdictional evidence, whether the evidence is presented with the notice of removal, motion to remand, or in response to a motion to remand. *See, e.g., Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1209 n.56 (11th Cir. 2007); *AAA Abachman Ent., Inc. v. Stanley Steemer Int., Inc.*, 268 F. App'x 864, 866 (11th Cir. 2008); *Fuzzell v. DRC Emerg. Servs.*, 2015 WL 412889, at *3 (N.D. Ala. Jan. 30. 2015) (citing *Pretka*

*v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 773 (11th Cir. 2010)).  When a non-removing party seeks remand, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin Op. Co. v. Owens*, 574 U.S. 81, 88 (2014) (citing 28 U.S.C. § 1446(c)(2)(B)).

A "removing defendant is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it." *Pretka*, 608 F.3d at 754. Indeed, "[t]he law does not demand perfect knowledge or depend any less on reasonable inferences and deductions than we all do in everyday life." *Id*. The court need not "'suspend reality or shelve common sense in determining whether the face of a complaint, or other document, establishes the jurisdictional amount.'" *Id*. at 770 (quoting *Roe v. Michelin N. Am.*, 637 F. Supp. 2d 995, 999 (M.D. Ala. 2009)). Importantly, the court's "analysis of the amount-in-controversy requirement focuses on how much is in controversy at the time of removal, not later." *Id*. at 751.

Here, it is not facially apparent from the complaint that the amount in controversy exceeds $75,000.  The complaint seeks specific performance, monetary damages, and other relief. Doc. 1-1 at 8–10.  More specifically, Quantalytix asks the court to find that Bui breached the Stockholders Agreement when he (1) failed to cooperate in good faith to select an appraiser and (2) failed to close on the sale of his stock at the purchase price determined by Applied Economics. Doc. 1-1 at 8–10.

11

The specific performance requested by Quantalytix amounts to the sale of his stock at $3.80 per share for a total of $28,211.20. Doc. 1-1 at 8–10.  And while not expressly stated in the complaint, Quantalytix also seeks "one-half of the $10,000 appraisal fee." Doc. 11 at 11.  So, on the face of the complaint, the amount in controversy is $33,211.20.

The court also considers the notice of removal and any evidence relevant to the amount in controversy at the time of removal. *See Jones*, 952 F. Supp. 2d at 1283. In his declaration and the notice of removal, Bui asserts that the amount in controversy exceeds $75,000 because (1) the fair value of his stock is more than $57,750.94 (7,423 shares at $7.78 per share) given the $13.84 buyback price from a former employee in December 2022 (a price that would make his shares worth $102,734.32) and the increased performance of Quantalytix since 2022; (2) he may be forced to pay Quantalytix $5,000 for the Applied Economics appraisal; and (3) the sale will require another appraisal costing between $25,000 and $35,000. Doc. 1 at  6–7; *see also* Doc. 10-1 at 6–9.  In fact, Bui estimates that "the minimum fair value of [his] shares is in excess of $200,000, given the $13.84 valuation in December 2022 and the material improvements in financial performance and significant investments and agreements since that time." Doc. 1 at 7 (emphasis omitted); *see also* Doc. 10-1 at 6–8.

Bui has not met his burden to establish that the amount in controversy exceeds

12

$75,000.  The evidence before the court on the valuation of Quantalytix's stock varies substantially.  First, there is the $13.84 per share that Quantalytix paid a former employee in December 2022.  The record does not reflect how the parties determined this price, the circumstances of the sale or, most importantly, any indication it was based on a fair market value calculation.[4] *See* Doc. 10-1 at 54. Second, there is the price of $7.78 per share Quantalytix offered Bui in May 2025. Doc. 10-1 at 49.  This price per share corresponds with the "fair market value for equity issuance" in April 2022, Doc. 6-1 at 3, but there is no explanation of why Quantalytix elected to offer this price in 2025. Doc. 10-1 at 49.  And finally, there is the $3.80 per share appraisal by Applied Economics. Doc. 6-1 at 3 & 4.  While the record includes three potential valuations, the Applied Economics appraisal is the only non-speculative evidence before the court of the fair market value of Bui's stock.  And based on its timing in mid-2025, this appraisal incorporates the alleged improvements to Quantalytix's finances on which Bui pegs a higher stock valuation. Bui may disagree with Applied Economics' methodology and conclusion, but he has not introduced a competing valuation.  Instead, he merely states his personal belief that the fair market value is higher than $7.78 per share. Doc. 10-1 at 8.  Bui's belief carries little weight when he has no technical knowledge or experience with business

---

[4] The documentation in the record related to the sale shows a purchase price of $20,000, not a price per share analysis. Doc. 10-1 at 54.

13

valuation principles.[5] *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (concluding that an officer's valuation at trial was inadmissible lay testimony because it "require[d] more than applying basic mathematics" and instead required "technical judgment"); *Kipperman v. Onex Corp.*, 2010 WL 11505688, at *21 (N.D. Ga. Sept. 29, 2010) (finding that "a business owner is not permitted to give lay testimony on matters that go beyond straightforward common-sense calculations").

In addition, the court is reluctant to consider Bui's claim that the amount in controversy should include the cost of a second appraisal. The complaint does not request a new appraisal; it asks for an order compelling Bui to sell his shares at $3.80 per share and to pay $5,000 for his half of the Applied Economics appraisal. The cost of a new appraisal could come into play if Bui were to file a counterclaim seeking this relief. But for removal purposes, the court evaluates only the damages sought in the complaint. *See Pretka*, 608 F.3d at 751 (explaining that the court's "analysis of the amount-in-controversy requirement focuses on how much is in controversy at the time of removal, not later"); *McDaniel v. Fifth Third Bank*, 568 F. App'x 729, 730–31 (11th Cir. 2014) (holding that a court's consideration of the

---

[5] Based on the record before the court, Bui's opinion testimony is likely to be inadmissible at trial. "In determining whether the district court has jurisdiction over a removed case pursuant to 28 U.S.C. §§ 1332 and 1441, a federal court may consider 'summary-judgment-type-evidence'— meaning relevant evidence that would be admissible at trial." *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) (quoting *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001)).

14

merits of a plaintiff's claims before deciding its jurisdiction "constitutes error");

*Conf. Am., Inc. v. Q.E.D. Int., Inc.*, 50 F. Supp. 2d 1239, 1242 (M.D. Ala. 1999)

(finding that "the amount in controversy for removal purposes is to be determined

solely by referring to the plaintiff's complaint and without regard to any

subsequently filed counterclaims") (citations omitted).

For these reasons, the court cannot conclude that the amount in controversy

exceeds $75,000.  The motion to remand is due to be granted.

### III.  CONCLUSION

It is ORDERED that Motion to Remand (Doc. 6) is GRANTED and this case

is REMANDED to the Circuit Court of Jefferson County, Alabama.

DONE and ORDERED on May 7, 2026.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

15